**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**WESTERN DIVISION**

**LONNIE JOSEPH PARKER, M.D., on behalf**                              **PLAINTIFFS**
**of himself and his Medicaid patients; TONYA**
**WITHERSPOON and SARA SUNDERMAN**

**VS.**                               **4:13-CV-00538-BRW**

**JOHN SELIG, in his Official Capacity as**                              **DEFENDANT**
**Director of Arkansas Department of Human**
**Services**

## ORDER

Pending is Plaintiffs' Motion for a Preliminary Injunction (Doc. No. 1).  Defendant has responded.[1]  I heard oral arguments on September 26, 2013.  Following the hearing, the parties supplemented their pleadings with articles on whether sex offenders convicted of possessing sadistic child pornography posed a threat or danger to others.[2]  After reviewing the parties' written submissions, and considering their oral arguments, the Motion is DENIED.

## I.    BACKGROUND[3]

Plaintiffs seek to enjoin enforcement of Act 1504 of the 2013 Regular Session of the 89th Arkansas General Assembly.  Act 1504 amended Arkansas's Sex Offender Registration Act of 1997 by adding two provisions.  The first provision provides that sex offender registration records "shall be open to the Division of Medical Services of the Department of Human Services for Medicaid provider applicants under § 12-12-925."[4]  The second provision states:

---

[1]Doc. No. 8.

[2]Doc. Nos. 14, 15.

[3]Unless noted otherwise, the facts in the background section are from Plaintiffs' Complaint.  *See* Doc. No. 3.

[4]Ark. Code Ann. § 12-12-913(a)(3).

1

If a court has entered an order requiring a person to register as a sex offender or if the person is listed in the Federal Bureau of Investigation's National Sex Offender Registry, the United States Department of Justice Dru Sjodin National Sex Offender Public Website, or both, the person shall not provide goods or services under the Arkansas Medicaid Program.[5]

Plaintiff Lonnie Parker is a physician licensed to practice medicine in Arkansas.  He provides emergency and general family medical services (including family planning) to rural Arkansawyers, and is a registered provider under the Arkansas Medicaid Program.

In May 2000, a jury convicted Parker of possessing child pornography in violation of federal law.[6]  He was sentenced to 37 months' imprisonment with three years of supervised release.  Less than a week before he was to begin serving his sentence, Parker sought a new trial asserting newly discovered evidence and alleging that the prosecution failed to disclose exculpatory evidence relating to his participation in an undercover operation in Minnesota.[7]  The district court denied Parker's request, finding that he had failed to establish that the new evidence would result in an acquittal.

Parker appealed his conviction and the district court's denial of his motion for a new trial. On appeal, he argued that the district court erred by refusing to instruct the jury on the public authority defense because, according to Parker, "he was assisting law enforcement officials in their attempt to identify and apprehend persons sending him pornographic material to his Internet account."[8]  He also asserted that the district court erred by denying his motion for a directed verdict.  Parker claimed that he was entitled to a directed verdict based on entrapment by

---

[5]Ark. Code Ann. § 12-12-95.

[6]See *U.S. v. Parker*, No. 4:98-CR-00236-GH (E.D. Ark. Sept. 18, 2000).

[7]See *U.S. v. Parker*, 267 F.3d 839, 841-42 (8th Cir. 2001).

[8]*Id.* at 843.

estoppel because law-enforcement officers told him that possessing child pornography was legal.[9]
Lastly, Parker alleged that the verdict should be overturned because the evidence was insufficient
to show he intended to possess child pornography.  Parker asserted that "his reason for
possessing child pornography was an honorable one -- to assist law enforcement in combating
exploitation of children . . . ."[10]

The prosecution filed a cross-appeal, arguing that the district court erred by refusing to
enhance Parker's sentence based on the sadistic nature of the pictures Parker possessed.[11]

The Eighth Circuit affirmed Parker's conviction.  The court held that the district court did
not err by refusing to instruct the jury on the public-authority defense because "[t]here was no
evidence presented that Parker acted on the request or advice of a duly authorized law
enforcement official concerning his continued possession and accumulation of child
pornography . . . ."[12]  The court further held that Parker was not entitled to a directed verdict,
stating:

> Parker can point to no evidence illustrating that he reasonably relied upon a law
> enforcement official's assertion that possessing child pornography was legal or that
> any such assertion was made to him.  The evidence instead indicates that Parker was
> fully aware that his possession of such materials was a crime.  Furthermore, Parker
> failed to comply with law enforcement officers' repeated instruction to deliver any
> previously obtained material to the appropriate office.[13]

As to sufficient evidence of intent, the court noted that when Parker was questioned
initially about the child pornography, he stated that his daughter had inadvertently received the

---

[9]*Id.* at 844.

[10]*Id.* at 845 (internal quotations omitted).

[11]*Id.* at 846-47.

[12]*U.S. v. Parker*, 267 F.3d 839, 844 (8th Cir. 2001).

[13]*Id.*

images, but later admitted that he was the one who received the images.[14]  Moreover, Parker told

law-enforcement agents that he knew it was illegal to transport child pornography across state

lines.  Consequently, the court found that sufficient evidence supported Parker's conviction.[15]

The court also affirmed the denial of Parker's request for a new trial, and stated that the

evidence "in no way indicates that Parker was advised by law enforcement officers to assist with

their investigation" but showed that he "had been involved with child pornography since 1996."[16]

However, the Eighth Circuit reversed and remanded the case to the district court for

resentencing, finding that the district court erred in denying the prosecution's request for an

enhancement.  In discussing the photographs Parker possessed, the Eighth Circuit stated, "[t]he

images at issue depict the following acts (among others) being inflicted upon minor female

children: sexual penetration by a minor girl upon herself by using a large carrot, forced oral sex,

an adult male ejaculating into the face and open mouth of a crying baby, and adult males standing

over and urinating in the face of a female child."[17]  The court concluded that "given the violent

and depraved nature of the images, the district court did err in deciding that the conduct

portrayed in the photographs was merely deviant and not violent or sadistic so as to warrant the

four-level increase . . . ."[18]

---

[14]*Id.* at 845.

[15]*Id.*

[16]*Id.* at 846.

[17]*U.S. v. Parker*, 267 F.3d 839, 847 (8th Cir. 2001).

[18]*Id.*

On remand, Parker was sentenced to 57 months' imprisonment followed by three years of supervised released.[19]  Parker's medical license was revoked, and he was required to register as a sex offender.  Parker is currently listed on the Federal Bureau of Investigation's National Sex Offender Registry.

In this lawsuit, Parker continues to insist that his conviction was a miscarriage of justice. The jury and Eighth Circuit killed this contention graveyard dead, and I reject it out of hand.

Parker filed this action on behalf of himself and his Medicaid patients.  Plaintiffs Tonya Witherspoon and Sarah Sunderman are Medicaid recipients.  Parker is Tonya Witherspoon's primary-care physician, and he provides family-planning services to Sarah Sunderman.

Plaintiffs sued John Selig in his official capacity as the director of the Arkansas Department of Human Services -- the agency that governs the Arkansas Medicaid Program. Plaintiffs argue that Act 1504 violates 42 U.S.C. §§ 1396 and 1983, and the Supremacy, Contract, Bill of Attainder, and *Ex Post Facto* Clauses of the Federal Constitution.  Plaintiffs seek declaratory and injunctive relief -- a preliminary and permanent injunction barring enforcement of Act 1504.

## II.   PRELIMINARY INJUNCTION STANDARD

The factors a court considers in determining whether to grant a preliminary injunction under Rule 65 are: "(1) the likelihood of success on the merits; (2) the presence or risk of irreparable harm; (3) the balancing of the harms of granting or denying an injunction; and (4) the public's interest."[20]  The main purpose of a preliminary injunction is "to preserve status quo until,

---

[19]*Parker*, No. 4:98-CR-00236-GH, at Doc. No. 146.

[20]*CDI Energy Servs., Inc. v. West River Pumps, Inc.*, 567 F.3d 398, 401-02 (8th Cir. 2009).

upon final hearing, a court may grant full effective relief."[21]  The Eighth Circuit has cautioned that a preliminary injunction is an extraordinary remedy, and the party seeking the injunction bears the burden of establishing all four factors.[22]

No one factor is determinative, but the first factor is the most significant.[23]  Generally, a plaintiff seeking a preliminary injunction must only show a "fair chance" of succeeding on the merits -- *i.e.*, meaning something less than 50%.[24]  Howeveɾ, a plaintiff seeking to enjoin a state statute must show that he or she is likely to prevail on the merits -- *i.e.*, greater than 50% likelihood of succeeding on the merits.[25]  If a plaintiff's likelihood of succeeding on the merits is below 50%, a court may deny a preliminary injunction even if the other three factors weigh in the plaintiff's favor.[26]

## III.    DISCUSSION

### A.    The Likelihood of Success on the Merits

Plaintiffs assert six causes of action.  To obtain a preliminary injunction, they must show that they are likely to succeed on the merits of at least one claim.

---

[21]*Rathmann Grp. v. Tanenbaum*, 889 F.2d 787, 789-90 (8th Cir. 1989) (quotations and citations omitted).

[22]*Watkins v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).

[23]*Barrett v. Claycomb*, 705 F.3d 315, 320 (8th Cir. 2013).

[24]See *Pl. Parenthood Minn., N. D., S. D. v. Rounds*, 530 F.3d 724, 730 (8th Cir. 2008).

[25]*Id.*

[26]*CDI Energy Servs., Inc.*, 567 F.3d at 402.

### 1.    Bills of Attainder and *Ex Post Facto* Laws

Plaintiffs claims that Act 1504 violates the Federal Constitution's prohibition against bills of attainder because it inflicts punishment on a specific group of people without a judicial trial.[27] Bills of attainder are laws that impose punishment on a specific person or easily ascertainable members of a group without a judicial trial.[28]

Plaintiffs also assert that Act 1504 is an unconstitutional *ex post facto* law because it increases Parker's punishment for a crime he was convicted of 10 years earlier.  Unconstitutional *ex post facto* laws retroactively increase punishment for a criminal act.[29]

To succeed on either of these claims, Plaintiffs must show that Act 1504 is punitive.  To determine whether a law is punitive or civil in nature, I must first consider whether the law falls within the historical meaning of legislative punishment.[30]  I next consider the legislative purpose for enacting the law.[31]  If the purpose is to punish, no further inquiry is needed.[32]  If the purpose is to exercise a state's legitimate police and regulatory powers, I must determine whether the type and severity of burdens imposed further nonpunitive legislative purposes.[33]  A state law's "connection to a nonpunitive purpose is [the] most significant factor" in determining whether the

---

[27]Doc. No. 3.

[28]*Palmer v. Clarke*, 408 F.3d 423, 433 (8th Cir. 2005) (citing *Selective Serv. Sys. v. Minn. Pub. Interest Research Grp.*, 468 U.S. 841, 847 (1984)).

[29]*Calder v. Bull*, 3 U.S. 386, 390 (1798).

[30]*Palmer*, 408 F.3d at 433-34 (quoting *Selective Serv. Sys.*, 468 U.S. at 852).

[31] *Smith v. Doe*, 538 U.S. 84, 93-94 (2003) (internal quotations and citations omitted).

[32]*Id.* at 92.

[33]*Palmer*, 408 F.3d at 433-34 (quoting *Selective Serv. Sys.*, 468 U.S. at 852).

law is punitive.[34]  Because courts ordinarily defer to a legislature's stated purpose, "only the clearest proof" will suffice to "transform what has been denominated a civil remedy into a criminal penalty."[35]

After considerable cerebration, I am satisfied that Act 1504 does not inflict the type of punishment prohibited by the Bill of Attainder and *Ex Post Facto* Clauses of the Federal Constitution.

First, Act 1504 does not impose punishment in the traditional sense.  Deprivations that traditionally have been viewed as punishment include death, imprisonment, banishment, confiscation of property, or deprivation of employment or participation in a trade or trade union.[36]  Act 1504 imposes none of these.  Though it prohibits certain sex offenders from dispensing goods or services under Arkansas's Medicaid Program, it does not deprive those offenders of employment in general, nor specifically bar them from practicing their professions.

Next, the purpose for which the Arkansas General Assembly passed Act 1504 is not punitive.  This purpose is found in the law that Act 1504 amends -- Arkansas's Sexual Offender Registration Act of 1997.[37]  There, the Arkansas General Assembly expressed that because "sex offenders pose a high risk of reoffending after release from custody, protecting the public from sex offenders is a primary governmental interest . . . ."[38]  Moreover, both the Court of Appeals for the Eighth Circuit and the Arkansas Supreme Court have held that the Registration Act is a

---

[34]*Smith*, 538 U.S. at 102 (internal quotations omitted).

[35]*Id.* at 92 (internal quotations omitted).

[36]See *Nixon v. Adm. of Gen. Servs.*, 433 U.S. 425, 474 (1977).

[37]Ark. Code Ann. §§ 12-12-901 through 12-12-926.

[38]Ark. Code Ann. § 12-12-902.

valid and nonpunitive exercise of Arkansas's police powers.[39]  Accordingly, the stated purpose of Act 1504 is nonpunitive.

Lastly, the restriction Act 1504 imposes on sex offenders (prohibiting them from providing goods and services to Medicaid patients) is incident to the state's legitimate police power (protecting the safety and health of its citizens).  Courts have routinely upheld statutes that prohibit certain convicted persons from holding professional licenses against constitutional challenges brought under the Bill of Attainder and *Ex Post Facto* Clauses.[40]  Since Act 1504 does not completely prohibit sex offenders from holding medical licenses, but merely limits the services offenders can provide, I cannot agree that it inflicts "punishment."  Accordingly, though Act 1504 is likely to limit Parker's patient base, it does not violate the Federal Constitution's proscription of *ex post facto* laws and bills of attainder.

### 2.      The Medicaid Act

Plaintiffs Tonya Witherspoon and Sara Sunderman claim that Act 1504 violates the Medicaid Act's free-choice-of-provider provision by prohibiting Medicaid beneficiaries from seeking Medicaid services from the provider of their choosing, and by excluding providers for reasons unrelated to their professional qualifications.[41]

---

[39]See *Weems v. L.R. Police Dep't*, 453 F.3d 1010 (8th Cir. 2006) and *Kellar v. Fayetteville Police Dep't*, 339 Ark. 274 (1999).

[40]See *Hawker v. N.Y.*, 170 U.S. 189, 190 (1898) (upholding law barring physician from practicing medicine for an earlier felony conviction); *De Veau v. Braisted*, 363 U.S. 144 (1963) (holding that law excluding convicted felons from employment as officers of waterfront union was neither a bill of attainder nor an *ex post facto* law); see also *Bhalerao v. Ill. Dep't of Fin. & Pro. Reg.*, 834 F. Supp. 2d 775, 784-85 (N.D. Ill. 2011) (collecting cases).

[41]Plaintiffs' Complaint does not state which individual Plaintiffs bring claims under § 1396a(a)(23).  During the hearing, however, Plaintiffs' counsel stated that the § 1396a(a)(23) claims were brought on behalf of Dr. Parker's Medicaid patients only.

The free-choice-of-provider provision requires all state Medicaid plans to allow beneficiaries to receive covered services from any qualified provider.  Specifically, the provision has two state-plan requirements: First, all state Medicaid programs must allow Medicaid beneficiaries to obtain care from "any [provider] qualified to perform the service or services required [and] who undertakes to provide. . . such services."[42]  Second, the provision provides a "more specific layer of protection for patients seeking family planning services, requiring that enrollment of an individual eligible for [Medicaid] in a primary care case-management system . . . , a medicaid managed care organization, or a similar entity shall not restrict the choice of the qualified person from whom the individual may receive [family planning services]."[43]

In *O'Bannon v. Town Court Nursing Center*, the Supreme Court said that the free-choice-of-provider provision "gives [Medicaid beneficiaries] the right to choose among a range of *qualified* providers, without government interference."[44]  The Court further said that the provision impliedly "confers an absolute right to be free from government interference with the choice to [receive services from a provider] that continues to be *qualified*."[45]  The Court recognized, however, that the free-choice-of-provider provision does not give Medicaid beneficiaries the right to demand an "unqualified" healthcare provider be "qualified" or a right to

---

[42]42 U.S.C. § 1396a(a)(23)(A).

[43]*Pl. Parenthood Ariz. Inc. v. Betlach*, Nos. 12-17558, 13-15506, 2013 WL 4465871, at *2 (9th Cir. June 12, 2013) (*quoting* 42 U.S.C. § 1396a(a)(23)(B)).

[44]*O'Bannon v. Town Court Nursing Ctr.*, 447 U.S. 773, 785-86 (1980) (emphasis in original).

[45]*Id.* at 786 (emphasis added).

continue receiving Medicaid benefits for services rendered by a provider that is no longer "qualified."[46]

The Second Circuit Court of Appeals, relying on the Supreme Court's decision, addressed the rights conferred by the free-choice-of-provider provision in the context of a due-process claim and held:

> We read *O'Bannon* as holding that a Medicaid recipient's freedom of choice rights are necessarily dependant on a provider's ability to render services. No cognizable property interest can arise in the Medicaid recipient unless the provider is both qualified and participating in the Medicaid program.[47]

Thus, to determine Act 1504's validity, it must be determined to what extent Arkansas can decide who is qualified to provide Medicaid services under its program, and whether Parker meets those standards.  The parties dispute the scope of Arkansas's authority to decide who is "qualified."

Federal law is clear that states have some authority to regulate who is qualified to provide Medicaid services under their plans.  The Medicaid regulations provide that states can establish "reasonable standards relating to the qualifications of providers."[48]  The Seventh Circuit Court of Appeals determined that this authority "does not suggest that states are free to ascribe *any* meaning to the statutory term 'qualified' -- including a meaning entirely strange to those familiar with its ordinary usage."[49]  "[W]hen read in context," the court said, "the term 'qualified' as used in [the free-choice-of-provider provision] unambiguously relates to a provider's fitness to

---

[46]*Id.*

[47]*Kelly Kare, Ltd. v. O'Rourke*, 930 F.2d 170, 178 (2d Cir. 1991).

[48]42 C.F.R. § 431.51(c)(2).

[49]*Pl. Parenthood of Ind., Inc. v. Comm'r of the Ind. State Dep't of Health*, 699 F.3d 962, 978 (7th Cir. 2012) (quotations omitted) (emphasis in original).

perform the medical services the patient requires. . . .  To be 'qualified' in the relevant sense is to

be capable of performing the needed medical services in a professionally competent, safe, legal,

and ethical manner."[50]  Ultimately, the Seventh Circuit rejected the argument that states have the

authority to establish provider-eligibility criteria based on any legitimate state interest, stating:

> That interpretation of § 1396a(a)(23) would lead to strange results.  If the states are
> free to set any qualifications whey want -- no matter how unrelated to the provider's
> fitness to treat Medicaid patients -- then the free-choice-of-provider requirement
> could be easily undermined by simply labeling any exclusionary rule as a
> "qualification."  This would open a significant loophole for restricting patient choice,
> contradicting the broad access to medical care that of § 1396a(a)(23) is meant to
> preserve.[51]

The Seventh Circuit, however, went on to say that "states retain considerable authority to

establish licensing standards and other related practice qualifications for providers -- this residual

power is inherent in the cooperative-federalism model of the Medicaid program and expressly

recognized in the Medicaid regulations."[52]

The Ninth Circuit Court of Appeals recently agreed with the Seventh Circuit, and held

that "the free-choice-of-provider provision unambiguously requires that states participating in the

Medicaid program allow covered patients to choose among the family planning medical

practioners they could use were they paying out of their own pockets."[53]

Looking to the Seventh and Ninth Circuits' opinions, Parker appears to be "qualified," in

the general sense, to provide Medicaid services in Arkansas because he has a medical license

---

[50]*Id.*

[51]*Id.*

[52]*Id.* at 980.

[53]*Betlach*, 2013 WL 4465871, at *9.

approved by Arkansas's State Medical Board.  However, as the Ninth Circuit recognized, state authority to determine provider qualifications covers more than just licensing requirements.[54]

The Medicaid Act and its regulations provide certain grounds for excluding providers from participating in state plans.  These provisions make clear that there is no requirement for states to allow every person licenced by the state to provide services under its Medicaid program.  Thus, I do not believe that merely because Arkansas licensed Parker to practice medicine, it is prohibited from excluding him from its Medicaid program.

Defendant argues that the grounds for excluding providers under Act 1504 is expressly permitted by the free-choice-of-provider provision, which states that "nothing in [the provision] shall be construed as requiring a State to provide medical assistance for such services furnished by a person or entity convicted of a felony under Federal or State law for an offense which the State agency determines is inconsistent with the best interests of beneficiaries under the State plan . . . ."[55]  According to Defendant, Act 1504 prohibits only certain felon sex offenders, whose participation in Arkansas's plan is not in the best interest of Arkansas Medicaid beneficiaries, from participating in its Medicaid plan.

While I do not read Act 1504 to be as restrictive as Defendant contends, assuming Defendant's interpretation is correct, Act 1504's prohibitions square with the powers reserved to the states by the free-choice-of-provider provision.  However, even though I am not convinced that Act 1504 prohibits only felon sex offenders from providing goods and services in Arkansas's program while they are required to register as sex offenders, I still believe Act 1504 is consistent with the federal Medicaid laws.

---

[54]*Pl. Parenthood of Ind.*, 699 F.3d at 980.

[55]*See* Doc. No. 14; 42 U.S.C. § 1396a(a)(23).

Specifically, the Medicaid Act provides that "a State may exclude any individual or entity for purposes of participating under the State plan . . . for any reason for which the Secretary could exclude the individual or entity . . . under section 1320a-7, 1320a-7a, or 1395cc(b)(2) of this title."[56]  Under section 1320a-7, the Secretary may exclude the following from participating under a State plan:

Any individual or entity --

(A) whose license to provide health care has been revoked or suspended by any State licensing authority, or who otherwise lost such a license or the right to apply for or renew such a license, for reasons bearing on the individual's or entity's professional competence, professional performance, or financial integrity, or

(B) who surrendered such a license while a formal disciplinary proceeding was pending before such an authority and the proceeding concerned the individual's or entity's professional competence, professional performance, or financial integrity.

Any individual or entity which has been suspended or excluded from participation, or otherwise sanctioned, under --

(A) any Federal Program, including programs of the Department of Defense or the Department of Veterans Affairs, involving the provision of health care, or

(B) a State health care program, for reasons bearing on the individual's or entity's professional competence, professional performance, or financial integrity.[57]

Moreover, state authority to exclude providers is also recognized by the Medicaid regulations.[58]  One such regulation, entitled "State-Initiated Exclusions from Medicaid," provides that "a State may exclude an individual or entity from participation in the Medicaid program for any reason for which the Secretary could exclude that individual or entity."[59]  It then reads:

---

[56] 42 U.S.C. § 1396a(p)(1).

[57] *See* 42 U.S.C. § 1320a-7(b)(4), (5).

[58] See *Guzman v. Shewry*, 552 F.3d 941, 949 (9th Cir. 2009).

[59] 42 C.F.R. § 1002.2(a).

"Nothing [in the regulations] should be construed to limit a State's own authority to exclude an individual or entity from Medicaid for any reason or period authorized by State law."[60]

Based on my reading of the law and regulations, Arkansas may exclude a provider from participating in its Medicaid plan for the same reasons it may deny, revoke, or suspend a provider's license.

Arkansas law says that "[n]o person shall be granted a licence to practice medicine . . . unless he or she . . . [i]s of good moral character and has not been guilty of acts constituting unprofessional conduct as defined in § 17-95-409."[61]   Section 17-95-409 says that unprofessional conduct includes "[c]onviction of any crime involving moral turpitude or conviction of a felony."[62]   Unprofessional conduct is also grounds for revoking an existing license.[63]

Though the statute does not state which crimes involve moral turpitude, the Arkansas Supreme Court has said:

> "Moral turpitude" is a well-defined and easily understood term. In *Fort v. Brinkley*, 87 Ark. 400, 112 S. W. 1084, this court defined it as follows: "'Moral turpitude' refers to an act of baseness, vileness or depravity in the private and social duties which a man owes to his fellow men or to society in general, but not to such acts as are not of themselves immoral but whose illegality lies in the fact of their being positively prohibited." Webster defines the term as follows: "The quality of a crime involving grave infringement of the moral sentiment of the community as distinguished from statutory mala prohibita."[64]

---

[60]*Id.* at § 1002.2(b).

[61]Ark. Code Ann. § 17-95-403(b)(2).

[62]Ark. Code Ann. § 17-95-409(a)(2)(A)(i).

[63]*Id.* at § 17-95-409(a)(1).

[64]*State Med. Bd. v. Rodgers*, 190 Ark. 266 (1935) (overruled on other grounds).

Act 1504 prohibits Parker from providing Medicaid services under Arkansas's plan because he is listed on the FBI's National Sex Offender Registry.  Since Parker's crime clearly was a felony involving moral turpitude, it appears unlikely that Plaintiffs can show that Act 1504 violates the free-choice-of-provider provision.

### 3.      Supremacy Clause

Plaintiffs allege that Act 1504 conflicts with the Medicaid Act's free-choice-of-provider provisions and are therefore preempted under the Supremacy Clause.  The Supremacy Clause "secures federal rights by according them priority whenever they come in conflict with state law."[65]  It is "not a source of any federal rights"[66] -- it only "ensures that the rule established by Congress controls."[67]

"Under the preemption doctrine, state laws that 'interfere with, or are contrary to the laws of Congress, made in pursuance of the Constitution' are preempted."[68]  "Where Congress has not expressly preempted or entirely displaced state regulation in a specific field, as with the Medicaid Act, 'state law is preempted to the extent that it actually conflicts with federal law.'"[69]  "An actual conflict arises where compliance with both state and federal law is a 'physical

---

[65]*Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 107 (1989).

[66]*Chapman v. Hous. Welfare Rights Org.*, 441 U.S. 600, 613 (1979).

[67]*Douglas v. Indep. Living Ctr. of  S. Cal, Inc.*, 132 S. Ct. 1204, 1213 (2012).

[68]*Lankford v. Sherman*, 451 F.3d 496, 509-10 (8th Cir. 2006) (quoting *Wis. Pub. Intervenor v. Mortier,* 501 U.S. 597, 604 (1991)).

[69]*Id.* at 510 (quoting *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n,* 461 U.S. 190, 203–04 (1983)).

impossibility,' or where the state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"[70]

Although Medicaid is "a system of cooperative federalism, the same analysis applies; once the state voluntarily accepts the conditions imposed by Congress, the Supremacy Clause obliges it to comply with federal requirements."[71]

Assuming Plaintiffs have a private cause of action under the Supremacy Clause, they have failed to show that they are likely to succeed on this claim for the same reasons they are not likely to succeed on their claims under the free-choice-of-provider provision.  To prevail on a Supremacy Clause claim, Plaintiffs must identify a state law that actually conflicts with a federal law or regulation.[72]  And, here, Act 1504 appears to be consistent with the Medicaid Act and its regulations.

### 4.     Contract Clause

Parker argues that Act 1504 violates the Contract Clause of the Federal Constitution because it nullifies his contract with the state to provide Medicaid services and serves no legitimate public purpose.

Article I, Section 10, of the Constitution says, "No State shall . . . pass any . . . Law impairing the Obligations of Contracts."  The Contract Clause prohibits states from enacting legislation that retroactively impairs contract rights -- it does not affect contracts that are yet to be

---

[70]*Id.* (quoting *Pac. Gas & Elec. Co.*, 461 U.S. at 203-04).

[71]*Id.* (citing *Jackson v. Rapps*, 947 F.2d 332, 336 (8th Cir. 1991); *King v. Smith,* 392 U.S. 309, 316, 326–27 (1968); and *Pl. Parenthood of Houston & Se. Tex. v. Sanchez*, 403 F.3d 324, 337 (5th Cir. 2005)).

[72]*Equal Access for El Paso, Inc. v. Hawkins*, 562 F.3d 724, 730 (5th Cir. 2009).

entered.[73]  When a state impairs its own obligations under a contract, the level of scrutiny is higher.[74]  In any Contract Clause case, the focus is "whether the state law has, in fact, operated as a substantial impairment of a contractual obligation."[75]

In determining whether legislation violates the Contract Clause, courts use a three-part test.[76]  First, the court must determine whether the law substantially impairs a contractual relationship.  If the court determines that it does, it must then, under the second part of the test, determine whether the law serves an important and legitimate government interest.  If not, the law runs afoul of the contract clause.  If so, the court must then turn to the third part of the test, and determine whether the law is narrowly tailored and reasonably necessary to promote the public interest.[77]

The first part of the three part test has three components: "whether there is a contractual relationship, whether a change in law impairs that contractual relationship, and whether the impairment is substantial."[78]

Defendants argue that Parker's Contract Clause claim fails because he does not have a valid contract with the State.  While Parker's contract was not entered until after Act 1504 was passed by the General Assembly, it was in effect before the Act's effective date.  Thus, I am

---

[73]See *Ogden v. Saunders*, 25 U.S. 213, 295-96 (1827).

[74]*Allied Structural Steel Co. v. Spannus*, 438 U.S. 234, 244 n.15 (1978).

[75]*Energy Reserves Grp. v. Kan. Power & Light Co.*, 459 U.S. 400, 411 (1983) (quoting *Allied Structural Steel*, 438 U.S. at 244).

[76]*Honeywell, Inc. v. Minn. Life & Health Ins. Guar. Ass'n*, 110 F.3d 547, 551 (8th Cir. 1997) (citing *Gen. Motors Corp. v. Romein*, 503 U.S. 181, 186 (1992)).

[77]*Id.*

[78]See *Gen. Motors Corp.*, 503 U.S. at 186.

satisfied that a contract existed between Parker and Arkansas, and Act 1504 impaired that contract.

Impairment is not enough -- for Parker to prevail he must show that Act 1504 substantially impaired his contract.  "Substantial impairment," in analyzing a claim under the Contract Clause, is a term of art.  "Substantial impairment depends on 'the extent to which the parties' reasonable expectations have been disrupted.'"[79] To determine the extent of the impairment, a court must "determine whether the industry the complaining party has entered has been regulated in the past."[80]  This is because the Contract Clause's prohibitions are subject to the police powers of the states.[81]  In other words, the pervasiveness of regulation within an industry can render the impairment insubstantial because parties who willingly enter well-regulated industries do so with little expectation that their contractual rights will prevent a state from exercising any aspect of its police powers that is necessary to promote the health, safety, and general welfare of its citizens.

Likewise, the Supreme Court has held that when contracts "expressly recognize the existence of extensive regulation by providing that any contractual terms are subject to relevant present and future state and federal law[,]" future legislation that impairs the parties' obligations does not amount to substantial impairment.[82]

---

[79]*Hawkeye Commodity Promotions, Inc. v. Vilsack*, 486 F.3d 430, 437-38 (8th Cir. 2007) (quoting *In re Workers' Comp. Refund*, 46 F.3d 813, 819 (8th Cir. 1995)).

[80]*Id.* at 438 (quoting *Energy Reserves Group*, 459 U.S. at 411).

[81]*Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 503 (1987) ("It is to be accepted as a commonplace that the Contracts Clause does not operate to obliterate the police power of the States.") (quoting *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 389, 445 (1934)).

[82]*Energy Reserves Group*, 459 U.S. at 416; see also *Hawkeye Commodity Promotions, Inc.*, 486 F.3d at 438.

Here, there is no question that the medical-insurance industry is subject to heavy government regulation; thus, Parker cannot effectively argue that he did not expect governmental regulations to interfere with the provisions of his contract.  In Arkansas, providers participating in the Medicaid program, such as Parker, enter into a contract with DHS.  Under the contract, Parker agreed to the following:

> To accept all changes legally made in the Program, and recognize and abide by such changes upon being notified by the Medicaid Program in the form of an update to, or an Official Notice/Remittance Advice Message pertaining to, the appropriate Arkansas Medicaid Provider Manual.

> That the Department has furnished the Provider with a copy of the Arkansas Provider Manual containing the rules, regulations and procedures pertaining to his/her profession. The Provider agrees that the terms and conditions contained therein shall be a part of this contract if the same were set out verbatim herein.

> To conform to all Medicaid requirements covered in Federal or State laws, regulations or manuals.[83]

The Arkansas Medicaid Provider Manual states:

> Any provider of health care services <u>must</u> be enrolled in the Arkansas Medicaid Program before Medicaid will cover any services provided by the provider to Arkansas Medicaid beneficiaries. Enrollment as a Medicaid provider is contingent upon the provider satisfying all rules and requirements for provider participation as specified in the applicable provider manual, state and federal law.  Persons and entities that are excluded or debarred under any state or federal law, regulation or rule are not eligible to enroll, or to remain enrolled, as Medicaid providers.[84]

Based on the provisions in Parker's provider contract, and those in the Provider Manual, Parker is unlikely to prevail on the merits of his Contract Clause claim because it appears that Act 1504 does not constitute a <u>substantial</u> impairment of his contractual rights.

---

[83]Doc. No. 9-1.

[84]Arkansas Department of Health and Human Services, *Medicaid Provider Manual*, https://www.medicaid.state.ar.us/InternetSolution/Provider/docs/famplan.aspx (last visited Oct. 10, 2013).

### 5.      Substantive Due Process

Parker contends that Act 1504 violates his substantive due process rights by depriving

him of a protected property interest -- his Medicaid contract with the state.  It is settled that a

contract with a state agency can constitute a property right protected by the Due Process Clause.[85]

However, the "majority rule is that state-created employment or contract rights are generally not

entitled to the protections of substantive due process."[86]  There are two categories of state

contracts that are protected by the substantive Due Process Clause: (1) those that confer a

protected status, "such as those characterized by a quality of either extreme dependence in the

case of welfare benefits, or permanence in the case of tenure, or sometimes both, as frequently

occurs in the case of social security benefits"; and (2) those can only be terminated by the state

for cause.[87]

Parker's contract appears to fit in neither of these categories.  Although Parker testified

that 70-75% of his patients are Medicaid recipients and that his revenue had decreased by about

50% since Act 1504 went into effect, his contract cannot properly be characterized by a quality of

extreme dependence, such as agreements providing for welfare or social security benefits.  Since

Parker is able-bodied and has a medical license, he can earn a living without the contract.  Thus,

his contract does not appear to be one of "extreme dependence."  Furthermore, his contract

cannot be characterized as permanent in nature, such as a contract for tenure.  His contract is

renewed on a yearly basis unless notice of termination is given, and failure to meet certain DHS

---

[85]*Omni Behavioral Health v. Miller*, 285 F.3d 646, 652 (8th Cir. 2002).

[86]*Stevenson v. Blytheville Sch. Dist. No. 5*, No. 3:13-CV-00127-KGB, 2013 WL 3324016 (E.D. Ark. July 1, 2013) (quoting *Peterson v. N.D.*, 240 F. Supp. 2d 1055, 1063 (D.N.D. 2003)).

[87]*Omni Behavioral Health*, 285 F.3d at 652 (quoting *Unger v. Nat'l Residents Matching Program*, 928 F.2d 1392, 1399 (3d Cir. 1991)).

requirements or comply with any applicably state or federal law and regulation is grounds for terminating the agreement.[88]   Also, because Parker's contract can be voluntarily terminated by either party after notice is given, it does not fall into the second category of state contracts protected by the substantive Due Process Clause.[89]

Lastly, a majority of courts have held that a healthcare provider has no protected interest in continued participation in a state's Medicaid program.[90]   Parker has failed, at this point, to show that Act 1504 deprives him of an interest protected by the Due Process Clause. Thus, he has not shown that he is likely to succeed on the merits of his substantive due process claim.

The other Plaintiffs contend that Act 1504 violates their substantive due process rights by depriving them of their protected interest to receive Medicaid services from a provider of their choosing.   It is well established that Medicaid benefits are a protected property interest under the Fourteenth Amendment.[91]   It is unlikely, however, that Plaintiffs have an interest protected by the Fourteenth Amendment in receiving services from Parker.

Federal law allows Medicaid beneficiaries to choose among a range of qualified providers.[92]   But, as an overwhelming majority of courts have noted, that choice is not absolute. Where a state has deemed a provider to be unqualified, Medicaid beneficiaries have no protected

---

[88]Doc. No. 8-1.

[89]*Id.*

[90]See *Erickson v. Dep't of Health & Human Servs.*, 67 F.3d 858, 862 (9th Cir. 1995); *Kelly Kare v. O'Rourke*, 930 F.2d 170, 176 (2d Cir. 1991); *Thorbus v. Bowen*, 848 F.2d 901, 903–04 (8th Cir. 1988).

[91]See *Goldberg v. Kelly*, 397 U.S. 254 (1970).

[92]42 U.S.C. § 1396a(a)(23).

interest in receiving Medicaid services from that provider.[93]  Since Parker is not a qualified provider in the Arkansas Medicaid Program, his patients have little chance of showing a substantive due process violation.

In sum, Plaintiffs have not shown that they are likely to succeed on the merits of any of their claims.  Accordingly, the first factor weighs in favor of denying Plaintiffs' Motion.

## B.    Irreparable Harm

As long as Act 1504 is enforced, Parker cannot provide services under Arkansas's Medicaid program.  During the hearing, Parker testified that 70-75% of the patients he sees at his urgent care clinic are Medicaid beneficiaries.  He also stated that, because he cannot be reimbursed for healthcare services by the state under Act 1504, his clinic has lost about 50% of its revenues since Act 1504 became effective.

Even if Parker were to prevail in this action, he could not recover his lost revenues as damages because the Eleventh Amendment prevents him from seeking damages from the state.  Thus, Plaintiffs have met their burden of showing that it is likely they will suffer irreparable harm if a preliminary injunction is not granted.  This element weighs in Plaintiffs' favor.

## C.    Balancing of Harm

The parties agree that Parker is the only provider in Arkansas prohibited from participating in Medicaid because of his status as a registered sex offender.  Thus, if Plaintiffs' Motion is denied, only he and his Medicaid patients will be affected.  Parker certainly will suffer financially in the absence of an injunction, and an unknown number of his Medicaid patients will be denied the choice of a healthcare provider that is available to others who do not rely on Medicaid benefits.  I note, however, that Plaintiffs have not alleged that other providers of

---

[93]See *O'Bannon*, 447 U.S. 733; *Kelly Kare, Ltd.*, 930 F.2d 170.

Medicaid services are lacking in their areas.  In sum, Plaintiffs have only demonstrated a minimal risk of harm if Act 1504 is not enjoined.

If, on the other hand, the motion is granted, Parker will be able to provide general and family planning services under Arkansas's Medicaid Program to needy individuals, including foster children.  My concern here lies with the potential harm to which Parker's Medicaid patients could be exposed.

When Parker was released from prison he was required under Arkansas law to register as a sex offender.[94]  To complete registration, Parker underwent a community notification assessment by the Sex Offender Screening & Risk Assessment Program to determine his sex offender classification.[95]  The Program uses the guidelines implemented by Arkansas's Sex Offender Registration Committee, which is the committee "charged with promulgating guidelines and procedures for disclosure of relevant and necessary information to the public when the release of information is necessary for the public protection."[96]  Under the  guidelines, there are four classification levels of sex offenders:

Level 1:  Typically offenders in this category have no prior history of sexual offending and the community can be protected with notification inside the home and to local law enforcement authorities. Level 1 would not generally be appropriate with prepubescent victim(s), predatory behavior, sexual interest in children, a history of working with children or around children if the victim was a child, and allegations of force or threats of physical harm were used in the offense.

Level 2:  Typically offenders in this category have a history of sexual offending where notification inside the home is insufficient. Community notification requires

---

[94]*See* Ark. Code Ann. § 12-12-905.

[95]See *Sex Offender Assessment Committee Guidelines and Procedures 2012*, http://adc.arkansas.gov/Documents/SexOffendersGuidelines2012.pdf (last visited October 1, 2013).

[96]*Id.* at 4.

notice to the offender's known victim preference and those likely to come into contact with the offender.

Level 3: Typically offenders in this category have a history of repeat sexual offending, and/or strong antisocial, violent or predatory personality characteristics. These are individuals whose offense and criminal history require notification throughout the community.

Level 4:  Sexually Violent Predator refers to a person who has been adjudicated guilty of a sex offense or acquitted on the grounds of mental disease or defect of a sex offense that makes the person likely to engage in predatory sex offenses.  The designation indicates that the highest and most visible means of community notification is required.[97]

The agency classified Parker as a Level 1 sex offender, but the guidelines provide that Level 1 is usually not appropriate for offenders with sexual interest in children or for those offenders who have a history of working with children or around children if the victim was a child.  Parker was convicted of possessing child pornography of a sadistic nature.  Furthermore, Parker, a general and family practitioner, works with children on a regular basis and on an intimate level.  In view of the nature of his conviction and the nature of his practice, I doubt that the Level 1 classification is accurate.

In light of these concerns, I required the parties to submit materials addressing whether sex offenders convicted of possessing sadistic child pornography posed a threat or danger to patients.  The submitted materials lead me to believe that there is no clear scientific answer.  It is clear, however, that some non-contact sex offenders, such as Parker, do pose a danger or threat of committing sexual-contact crimes.

---

[97]*Id.* at 22.

For example, the United States Sentencing Commission conducted a recidivism study of 610 federal non-production offenders.[98]  The study found that the group had a 7.4% rate of recidivism, with 22 offenders (3.6%) arrested or convicted of sexual-contact crimes.[99]  The Commission conceded, however, that the rate of recidivism was probably higher than the study indicates because recidivism rates were based on arrest and prosecution records, which "under-report offenders' actual rate of recidivism."[100]  In other words, the recidivism rates are based only on those offenders who were actually arrested or convicted for a later crime.  And several studies indicate that only 1 in 20 cases child sexual abuse is reported or identified.[101]  Other studies have shown recidivism rates between 10% and 50%.[102]

Although Parker has never been arrested or charged with a sexual-contact offense, studies show that between 62% and 85% of men convicted of non-contact sexual crimes (such as possession of child pornography) and who have no history of committing a contact offense, later admitted to committing at least one undetected sexual-contact offense.[103]

---

[98]U.S. Sentencing Comm'n, *Report to Congress: Federal Child Pornography Offenses*, Chapter 11: Recidivism by Child Pornography Offenders (Dec. 2012).

[99]*Id.* at 300.

[100]*Id.* at 294.

[101]Ryan Hall, MD and Richard Hall, MD, *A Profile of Pedophilia: Definition, Characteristics of Offenders, Recidivism, Treatment Outcomes, and Forensic Issues*, Mayo Clin. Proc., 82(4): 457-471, 460 (April 2007) (citing several reports and studies).

[102]*Id.* at 467 (citing multiple studies and reports).

[103]See *Id.* at 460; Andres Hernandez and Michael Bourke, *The"Butner Study" Redux: A Report of the Incidence of Hands-on Child Victimization by Child Pornography Offenders*, J. Fam. Viol., 24:183-191 (2009); and Andres Hernandez, *Self-Reported Contact Sexual Offenses by Participants in the Federal Bureau of Prisons' Sex Offender Treatment Program: Implications for Internet Sex Offenders* (Nov. 2000).

Considering this, I am satisfied that the balance weighs in favor of Defendant.  While the probability of a non-contact sex offender committing a sexual-contact crime <u>may</u> be low, an appreciable chance of exposing a child of tender years to sexual abuse outweighs any financial harms or inconvenience Act 1504 may cause.  I am going to err, if I am going to err at all, on the side of the children of tender years.  Accordingly, I find that a balance of the equities weighs in Defendant's favor.

### D.      Public Interest

Arkansas's Medicaid Program promotes the public interest -- so long as the program is administered consistently with the federal and state governments' intents.  As noted, Plaintiffs have failed to show, at this point, that Act 1504 is inconsistent with the federal or state legislative intent.  Furthermore, the public has expressed its interest in protecting the public from sex offenders.[104]  With both interests in mind, the public interest is best served by denying the Motion.

### CONCLUSION

Because State authorities have classified Parker as a Level 1 sex offender and have given him a license to practice medicine, at first blush, it appears that a federal district judge should defer to state authorities, which is the usual practice.  After considerable reflection, however, I cannot agree with this classification.  The nature of some of his child pornographic photos (described above) and the fact that he would be working with young children if his motion were granted is too strong for me.

---

[104]*See* Ark. Code Ann. § 12-12-902; *see also Arkansas Dep't of Corr. v. Bailey*, 368 Ark. 518, 533 (2007); *Kellar v. Fayetteville Police Dep't*, 339 Ark. 274 (1999).

Some writers have criticized courts and legislators for presuming that those convicted only of possession of child pornography present a danger to children.  This criticism may be well taken to some extent, and some rulings and enactments may well be too extensive.  Again, however, I must base my decision on the particular facts of this case; and Parker has not convinced me by the greater weight of the evidence that one who possesses child pornography of a sadistic nature does not pose a danger to children of tender years.

There may be additional evidence at the final hearing which will convince me otherwise, but, for the time being, I conclude that Plaintiffs' Motion for a Preliminary Injunction (Doc. No. 1) should be, and hereby is, DENIED.

IT IS SO ORDERED this 14th day of November, 2013.


/s/Billy Roy Wilson
UNITED STATES DISTRICT JUDGE